Donald C. Van Pelt v. Commissioner.
Van Pelt v. Commissioner
Docket No. 21411.
United States Tax Court
1950 Tax Ct. Memo LEXIS 130; 9 T.C.M. (CCH) 675; T.C.M. (RIA) 50193; August 10, 1950
*130 Held, the losses involved were the result of non-business debts and are deductible under the provisions of section 23 (k) (4) of the Internal Revenue Code. George L. Morris, Jr., Esq., 2253 Penobscot Bldg., Detroit 26, Mich., and Walter F. Kramer, Esq., for the petitioner. A. J. Friedman, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion There is in issue in this proceeding the liability of petitioner for deficiency in income tax for the year 1945 in the amount *131 of $26,078.90. [1] Certain adjustments made by the respondent are not contested. The only issue for decision is whether respondent erred in determining that the petitioner's loss on the worthlessness of his loans to Detroit-St. Clair Navigation Company and his loss on notes received in liquidation of the company are deductible as non-business bad debts under the provisions of section 23 (k)(4), Internal Revenue Code. Findings of Fact The petitioner is an individual whose business address is 1435 Franklin Street, Detroit, Michigan. The return for the period here involved was filed with the collector *132 of internal revenue for the district of Michigan. Petitioner resides at 8905 East Jefferson Avenue, Detroit. He is 53 years old. For the past 30 years he has been engaged in the steel and steel tubing business, primarily as an executive in companies manufacturing and merchandising steel and steel tubing. He is a partner of Service Steel Company of Detroit, and an officer and director of several other steel companies. Petitioner has been interested in and has operated pleasure boats since he was 10 years of age. He has owned and operated a dozen different types of pleasure boats. He is interested in marine navigation and has belonged to yacht clubs and to the Detroit Power Squadron, an organization of yachtsmen for the promotion and dissemination of navigation information to other boating enthusiasts. In 1937 petitioner and 23 other persons, some of whom were his friends, acquaintances and fellow boating enthusiasts, organized a corporation under the laws of the State of Michigan known as Detroit-St. Clair Navigation Company, (hereinafter referred to as Navigation), for the purpose of purchasing and operating for profit a passenger-freight steamboat known as the "City of Hancock". *133 The steamboat was 104 feet in length and had passenger capacity of approximately 200 persons and cargo space of about 5,000 cubic feet. Petitioner subscribed to and became the owner of 11,760 shares out of a total of 47,349 shares of the common stock issued and outstanding for which he paid a total price of $4,815. The remainder of the shares was distributed and held by the 23 other persons. Petitioner was one of the original incorporators of Navigation and held the office of secretary-treasurer. Harold Baldwin was president of the company from the day of its formation until 1940 when he resigned and petitioner became the president and general manager. Petitioner received no compensation for his services as general manager of the company while he acted in that capacity. During the years 1937, 1938 and 1939, Navigation operated the "City of Hancock" on regular and chartered trips from Detroit to the St. Clair Flats and between Sandusky, Ohio, and the Lake Erie Islands. It lost money during its operation in each of the years 1937, 1938 and 1939. In 1940, principally through the efforts of petitioner, Navigation was awarded a United States Army contract to transport passengers *134 and supplies between Houghton, Michigan, and three Civilian Conservation Corps camps on Isle Royale in Lake Superior. Navigation made a small profit of about $2,000 in that year. This contract was renewed for the 1941 season. In 1941, in accordance with the requirement of the United States Steamboat Inspection Service that a boat be put in dry dock at least once every five years, the "City of Hancock" was inspected and found to be satisfactory. When the vessel was in dry dock it was determined by petitioner, at the request of the captain of the "City of Hancock", that a coat of red lead should be placed on its bottom. In sand blasting, preparatory to putting on such coating, a number of pinholes in the bottom of the hull were opened and bilge water began running out. The inspection service then again checked the hull and determined that two new plates should be put in the hull. In doing this repair work it was discovered that other repairs would have to be made before the vessel could be passed for inspection by the Government officials. The total cost of putting the vessel in shape amounted to $29,629.92. That repair bill was paid by petitioner as a loan to Navigation. This loan *135 or advance was one of seven advances which petitioner made on behalf of the company. The following is a schedule of the amounts loaned by him to Navigation and the amounts received, either as interest or return of principal: Total Amounts
Interest
Principal
Balance of
Loaned
Received by
Repaid
Loan at
Year
During Year
Petitioner
Petitioner
End of Year
1938
$ 2,316.57
$ $ $ 2,316.57
1939
1,683.76
165.10
3,835.23
1940
7,995.92
577.44
10,231.15
1,600.00
1941
29,629.92
995.46
1,699.00
29,530.92
1942
365.48
448.10
30.92
29,865.48
1943
133.50
29,998.98
1944
61.32
30,060.30
Navigation lost money in operating the "City of Hancock" during the year 1941. The CCC project was abandoned shortly after the declaration of war in December, 1941, and Navigation was advised that the contract with the Army would not be renewed. Since no other use could be found for the vessel, it was tied up to its dock at the end of the 1941 season and remained tied up and out of use until April 2, 1945. From the time petitioner became the general manager of Navigation in 1940 until the end of the 1941 season when the "City of Hancock" *136 was put out of commission and was tied up to the dock, his duties as general manager consisted of handling correspondence with the Army in connection with the contract for the operating of the "City of Hancock", making telephone calls and conversing with the inspectors connected with the Steamboat Service as well as with officers of the United States Customs Service and the Treasury Department. He also filed returns with the Michigan Corporation and Securities Commission. He signed checks, maintained the corporation books of accounts and handled correspondence with the captain of the vessel. All of these services were confined to the years 1940 and 1941 as those were the only two years the boat was operated while petitioner was acting as general manager of Navigation. He made one trip to Fort Brady at Sault Ste. Marie. He held two conferences, and possibly a third one, with Army officers in Detroit. He employed the captain of the boat who rendered weekly reports to petitioner on the expenses and details of operation. He also paid all accounts in connection with the operation of the boat. The "City of Hancock" was sold by Navigation on April 2, 1945, to one Troy H. Browning for a *137 total contract price of $10,000, payable $500 in cash and the balance by Browning delivering four of his promissory notes to Navigation for $2,375 each, the first note becoming due on August 2, 1945, and the other notes maturing on April 2, 1946, August 2, 1946, and April 2, 1947. In addition Browning promised to furnish a marine mortgage and proper fire insurance coverage for the protection of the seller. Browning failed to supply the mortgage as agreed. He also failed properly to insure the vessel. That sale had been authorized at a meeting of the stockholders of Navigation held on February 2, 1945. Inasmuch as the proceeds of the sale of the steamboat were less than the indebtedness of the corporation to petitioner, and Navigation had no other assets of any substantial value, the stockholders authorized the corporate officers, after consummation of the sale to Browning, to assign all the corporate assets to petitioner in part payment of his loans. Pursuant to these instructions the corporate officers, after completion of the sale of the boat to Browning, paid the $500 in cash to petitioner and also endorsed over to him the Browning notes. Upon petitioner's receipt of the $500 *138 in cash and the $9,500 in promissory notes in final settlement of his claim against Navigation for advances, the balance of petitioner's advances in the amount of $20,060.30 became totally worthless in 1945. Navigation never was formally dissolved, but eventually lost its corporate charter by failure to file its Michigan Annual Reports for 1945 and 1946 and to pay the privilege fees in connection therewith. A fire broke out on the "City of Hancock" on October 5, 1945, necessitating the presence of a part of the Detroit Fire Department. Petitioner received a telephone call from Browning two weeks after the fire who told petitioner that "he was in a jam of some kind on the insurance" and asked petitioner if he would settle the notes for $8,000 cash. By that time the notes had been placed in the hands of petitioner's attorney who had been doing some investigating of Browning's financial condition. The attorney reported it to be unfavorable. Based upon such report, petitioner told Browning that he would acquiesce in accepting $8,000 in full settlement of the notes. However, petitioner did not hear from Browning after that conversation and was not successful in reaching him again. *139 Petitioner inspected the vessel a day after the fire and found it to be almost a complete loss. It could not have been operated without extensive repairs and it was not deemed feasible or practical to repair and place the vessel back in operation. Petitioner instructed his attorney in 1947 to commence an action against Browning for the recovery on the notes for $9,500. The attorney, pursuant to such instructions, commenced the suit, recovered a judgment, and had an execution issued against Browning which was returned unsatisfied. Petitioner's income in 1942 was $178,011.93; in 1944 it was $201,774.74., in 1945 it was $165,680.47, and in 1943 it was approximately the same amount as in 1945. No part of petitioner's income was earned as a result of his stockholdings in Navigation or because of any interests or personal efforts on behalf of that company or any other steamboat company operating or owning boats. Only a very small part of the income was earned by petitioner from his activities outside of the steel and steel tubing business and could be accounted for by dividends on stock which he held in large companies. Petitioner employed an attorney to prosecute a claim on the notes *140 against Browning in November 1945. That attorney advised petitioner that the claim was hopeless and that there was no fire insurance covering the vessel at the time it burned. The report indicated that Browning's financial responsibility was "nil". Acting upon that information petitioner instructed his accountant to prepare and file an amended Federal income tax return for the taxable year ended December 31, 1945, in which amended tax return he claimed a deduction for $9,500 on the notes of Browning which became worthless in 1945, and, accordingly, such amended return was prepared and filed. In preparing and filing his Federal income tax return for the year ended December 31, 1942, petitioner reported that the capital stock which he held in Navigation became worthless in 1942 and he, accordingly, took a deduction on his return for that year for such worthlessness. The office of the revenue agent in charge in Detroit, in examining the petitioner's return of income for 1942, raised some question concerning the deduction taken by petitioner on account of the worthlessness of such stock. In support of his claim of worthlessness petitioner submitted to the revenue agent in charge a statement *141 signed by him substantiating that such stock became worthless in 1942. The question of whether that stock became worthless in 1942 is not in issue here. Concerning the deduction claimed respondent stated as follows in the statement attached to the notice of deficiency: "The amount of $20,060.30 claimed in miscellaneous deductions on your income tax return for the year ended December 31, 1945, representing uncollectible loans to the Detroit-St. Clair Navigation Company, a corporation, of which you were an officer and stockholder, is disallowed to the extent claimed as it is determined that the loss is a non-business bad debt as defined by Section 29.23(k)-6 of Regulations 111 [applicable to section 23(k)(4), Internal Revenue Code]. However, capital loss subject to the limitations provided by Section 117 of the Internal Revenue Code, is allowed for the years 1945 and 1946 in the amount of $1,000.00 each year. "The deduction on your amended return filed for the year 1945 of an additional bad debt in the amount of $9,500.00 representing the unpaid balance on notes transferred to you by the Detroit-St. Clair Navigation Company at its *142 dissolution is disallowed, as it is determined that the loss is a non-business bad debt as defined by Section 29.23(k)-6 of Regulations 111." Opinion HILL, Judge: The respondent contends that the losses of $20,060.30 and $9,500 which petitioner suffered during 1945 by reason of advances to Navigation arose out of non-business debts and therefore are subject to the limiting provisions of section 23(k)(4), [2] Internal Revenue Code. The petitioner urges, however, that the losses involved are deductible in full in accordance with section 23 (e)(1)[3] of the Code. *143 In defining a non-business debt, section 23 (k)(4) supra, so far as applicable here, provides that "The term 'non-business debt' means a debt other than * * * a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business". Concerning that relationship between the loss and the taxpayer's trade or business, section 29.23(k)-6 of Regulations 111 states: "The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a non-business debt for the purposes of this amendment. [Section 23 (k) (4)]." (Italics supplied) See H.R. 2333, 77th Cong. 2d Sess., page 77. That section of the regulations was cited with approval in Robert Cluett, 3rd, 8 T.C. 1178, and the recently *144 decided case, W. A. Dallmeyer, 14 T.C. - (June 27, 1950). With respect to the question before us, the following excerpt from H.R. 2333, 77th Cong., 1st Sess., 1942-2 C.B. 431, commenting on sections 124 (a) and (d) of the Revenue Act of 1942, which added paragraph (4) to section 23 (k) is applicable: "A new provisions is added providing for special treatment of nonbusiness debts, applicable in the case of a taxpayer other than a corporation. If such a debt becomes entirely worthless within the taxable year, the loss resulting therefrom is to be considered a loss from the sale or exchange of a capital asset held for not more than 15 months. The provisions of section 23 (k)(1), as amended by this section, with respect to a debt which has become partially worthless, do not apply in the case of a nonbusiness debt; and a loss with respect to such a debt will be treated as sustained only if and when the debt has become totally worthless. Nor are these provisions with respect to nonbusiness debts applicable in the case of a loss resulting from a security as defined in section 23(k)(3). A nonbusiness debt is defined as a debt other than a debt the loss from the worthlessness *145 of which is incurred in the taxpayer's trade or business, and other than a debt evidenced by a security as that term is defined in section 23 (k)(3) of the Code. The question whether a debt is one, the loss from the worthlessness of which is incurred in the taxpayer's trade or business, is a question of fact in each particular case, and the determination is substantially the same as that which is made for the purpose of ascertaining whether a loss from the type of transaction covered by section 23 (e) is 'incurred in trade of business' under paragraph (1) of that section. The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a nonbusiness debt for the purpose of this amendment." Robert Cluett, 3rd, supra. *146 See also Regulations 111, section 29.23(k)-6. We believe contrary to respondent's contention, that petitioner was engaged from 1940 through the year in question, in addition to his regular business of being an executive in the steel industry, in the business of manager of Navigation. We do not agree with the petitioner, however, that the connection between the loss claimed and his business of managing the corporation, Navigation, was proximate within the meaning of the statute and the regulations. The facts show that the total loss of $29,560.30 which petitioner claims is deductible in full under the provisions of section 23 (e)(1) came about through his various loans to Navigation, the history of which is set forth in our findings. At the end of 1944 Navigation owed petitioner a balance of $30,060.30 on account of various loans which he had made to it. In 1945 the vessel was sold to Browning for $10,000 on terms of $500 cash and the balance of $9,500 payable in two years in installments of $2,375 each as evidenced by Browning's notes payable to Navigation. As the only asset the corporation had left after the sale of the vessel to Browning was the $500 cash and the notes for $9,500, *147 it assigned them to petitioner in settlement of his $30,060.30 loans. It is stipulated that $20,060.30 owed him by Navigation became worthless in 1945. And the facts show that the notes of $9,500 also became worthless in 1945 when petitioner ascertained that Browning was insolvent. It is thus apparent that some of the loans in question were made to Navigation by petitioner even before he became its manager. The facts do not disclose that petitioner was in the business of loaning money to corporations. And, in addition, it has not been shown that when petitioner assumed the duties of manager of Navigation one of his duties was to advance his personal funds for its salvation. His personal loans to Navigation, therefore, were entirely separate and apart from his business of managing that corporation. We accordingly conclude that the losses involved are deductible only under the limiting provisions of section 23 (k)(4), as respondent contends. We agree with petitioner that in seeking a solution of the problem here we should consult the decisions under sections 23(e)(1) of the Code. Several of such cases, we think, clearly support our finding here. One of these cases is William G. Park, Executor, 22 B.T.A. 1263, *148 affirmed 58 Fed. (2d) 965. There the president and director of a bank paid in a substantial sum to prevent closing of the bank when the treasurer embezzled a portion of the assets. He claimed a business loss arising out of the transaction. We said, page 1266: "* * * a loss of this kind is not one incurred in trade or business, as it is not a part of the trade or business of the president and directors of a corporation to make good the latter's losses. * * *" In the case of Friedman v. Delaney, 171 Fed. (2d) 269, an attorney, to fulfill a moral obligation resulting from his assurances that money would be available to carry out a composition in bankruptcy for his client, deposited $5,000 of his own money with the clerk of the bankruptcy court. The court denied a claimed business loss deduction in the following language, page 271: "Nor is the taxpayer in any better case [position] if he claims a deductible loss under Section 23 (e)(1). His was not a business loss made in carrying on a law practice. It is obviously no part of a lawyer's business to take on a personal obligation to make payments which should come from his client, unless in pursuance of *149 a previous understanding or agreement to do so. The voluntary nature of the action, resulting in the loss, takes it outside of this Section. * * *" Moreover, we think the recent case of W. A. Dallmeyer, supra, involving, as here, section 23 (k)(4), supports our finding. In that case a bank of which taxpayer was president, loaned a corporation a total of $27,571.38. He was criticized by the directors of the bank for recommending such loans. Subsequently the taxpayer acquired the unsecured notes of this corporation held by his bank in exchange for the collateral deposited with the bank and shortly thereafter the corporation to whom the money was loaned was adjudicated bankrupt. The taxpayer asserted there that the acquisition of these unsecured notes from the bank and the loss proximately related to his business of being chief executive of the bank. We said as follows: "* * * We agree with petitioner that in 1944, the year of alleged bad debt loss, the performance of the duties developing upon him as the executive head of the Exchange National Bank constituted the carrying on of a business. Commissioner v. People's-Pittsburgh Trust Co., 60 Fed. (2d) 187, and Ralph C. Holmes, 37 B.T.A. 865. *150 But we are convinced that there was no proximate relationship between the unsecured notes he acquired from the bank and his business at the time of the loss of the bank. On the contrary, the oral guarantee of these notes, the furnishing of a $15,000 note as collateral therefor, and the subsequent acquisition of these notes was an isolated undertaking entirely separate and apart from the performance of his duties as chief executive. The evidence reveals no prior understanding between petitioner and the bank that he should guarantee loans recommended by the loan committee and petitioner himself admits that no legal liability rested on him at the time he made his guarantee. It is clear that petitioner guaranteed the unsecured notes of Cole Motor held by the bank to the extent of $15,000 only as a consequence of a compelling moral responsibility he felt. In this sense his action was purely voluntary and outside the course of his business activities, even though he took this step as the result of criticism by the other directors." See also Burnet v. Clark, 287 U.S. 410. It follows that respondent's determination must be sustained. Decision will be entered under Rule 50. *151 Footnotes
1. The statutory notice of deficiency which forms the basis of this proceeding states the amount of the deficiency in income tax for 1945, determined against this petitioner, to be $55,310.31. However, since the mailing of such notice it has been established to respondent's satisfaction that petitioner paid $29,231.41 in income tax for 1945 at the time he filed an amended income tax return for that year in addition to the amount remitted at the time of filing his original return so that the amount of the deficiency for 1945 is $26,078.90 instead of $55,310.31.↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - * * *
(4) Non-Business Debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. ↩
3. (e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) If incurred in trade or business; or * * *↩